

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
02/05/2016

| | | |
|---|---|---|
| IN RE: | § | |
| **ATP OIL & GAS CORPORATION,** | § | **CASE NO: 12-36187** |
| Debtor. | § | |
| | § | **CHAPTER 7** |
| | § | |
| **DIAMOND OFFSHORE COMPANY,** | § | |
| Plaintiff, | § | |
| | § | |
| **VS.** | § | |
| | § | **ADVERSARY NO. 12-03425** |
| **BENNU OIL & GAS, LLC,** | § | |
| Defendant. | § | |
| | § | |
| **TM ENERGY HOLDINGS LLC, GMZ** | § | |
| **ENERGY HOLDINGS LLC, AND CLP** | § | |
| **ENERGY LLC,** | § | |
| Plaintiff, | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 12-03429** |
| | § | |
| **BENNU OIL & GAS, LLC** | § | |
| Defendant. | § | |

## AMENDED MEMORANDUM OPINION[1]

This Amended Memorandum Opinion concerns similar adversary proceedings filed by and Diamond Offshore Company (Adv. Pro. 12-03425) and TM Energy Holdings (Adv. Pro. 12-03429). Rodney Tow, Chapter 7 Trustee, has filed Amended Counterclaims for the avoidance and recovery of transfers made by ATP to TM and Diamond pursuant to 11 U.S.C. §§ 547 and 549 related to the conveyance of purported overriding royalty interests.

TM and Diamond, the putative ORRI Holders, have each filed motions to dismiss each of Tow's claims under various theories.

---

[1] This Amended Memorandum Opinion is issued to clarify certain matters over which reconsideration was sought by Diamond Offshore Company in Adversary Proceeding 12-3425. Because the amendments provide a more complete statement of the law, the Court is amending the Memorandum Opinion in both adversary proceedings.

Bennu has filed a motion to enforce the Final Sale Order and prevent the Trustee from pursuing § 549 claims sold to Bennu.   Bennu is correct.   Accordingly, Tow's remaining § 549 claims are dismissed with prejudice.

Tow's remaining § 547 claims survive both TM and Diamond's motions to dismiss.

### Background

On August 17, 2012, ATP filed a voluntary petition for relief under Chapter 11.   On August 23, 2012, the Court issued a Conveyance Order authorizing (1) Payment of Funds attributable to Overriding Royalty Interests in the Ordinary Course of Business and (2) Payment of Funds Attributable to Net Profits Interests Subject to Further Order of the Court Requiring Disgorgement Thereof . . . (Case No. 12-36187, ECF No. 191).   Pursuant to the Conveyance Order, the Court approved ATP's transfer of production proceeds to holders of overriding royalty interests and net profits interests, provided that holders of such interests executed an agreement to disgorge such funds upon subsequent order of the Court (i.e. "Disgorgement Agreement").

On October 17, 2013, the Court approved ATP's sale motions (Case No. 12-36187, ECF Nos. 1169, 1252, and 1492) and entered the Final Order (A) Approving the Sale of Certain of the Debtor's Assets Free and Clear of Claims and Liens and (B) Approving the Assumption and Assignment of Contracts and Leases (Case No. 12-36187, ECF No. 2706) (the "Final Sale Order") approving the Asset Purchase Agreement (the "APA") (Case No. 12-36187, ECF No. 2706-1) pursuant to which Bennu acquired the Purchased Assets (as defined in the Final Sale Order) via a credit bid of liens previously held by Credit Suisse AG, Cayman Islands Branch, as administrative agent for the DIP Lenders.

The Purchased Assets included ATP's interest in the Telemark leases (Atwater Valley Block 63, Mississippi Canyon 941 and 942).

Pursuant to the Final Sale Order, Bennu acquired the Purchased Assets burdened by certain ORRIs and Net Profit Interests (as defined in the Final Sale Order), including those that are the subject of the underlying adversary proceedings. *See* Final Sale Order at ¶ 29.

On June 26, 2014ATP's bankruptcy case was converted to a case under chapter 7 of the Bankruptcy Code.  Rodney Tow was appointed as Trustee.

### Adversary Proceedings

The ORRI holders have each filed a complaint seeking a declaratory judgment that its ORRI is its own real property and not property of the estate.  As counterclaims, ATP asserted claims for declaratory judgment that are the mirror image of the claims asserted in the ORRI holders' complaints: (i) that each ORRI constitutes a disguised financing arrangement and, therefore, constitutes property of the Debtor's estate and (ii) that each ORRI and related agreements constitute executory contracts. ATP also asserted claims for disgorgement.

On May 20, 2014, Bennu was substituted for ATP in these three adversary proceedings with respect to all claims that relate to the Purchased Assets. (Case No. 12-36187, ECF No. 172).

On November 13, 2014, Bennu filed its Motion to Determine Ownership of Claims (Case No. 12-03443, ECF No. 212) pursuant to which it sought a ruling from the Court that Bennu owned the counterclaims originally asserted by ATP in each adversary proceeding and, therefore, that such counterclaims could not be asserted by the Trustee.   The Trustee opposed the Ownership Motion.

### January 28, 2015 Ownership Order

On January 28, 2015, the Court issued its Order on the Ownership Motion. (ECF No. 236).  The Court ruled that Bennu has the exclusive right against TM and Diamond "to seek to re-characterize the alleged [TM or Diamond] Overriding Royalty interest as something other

than a vested ownership right granted to [TM or Diamond] in the hydrocarbons to be produced."
(Case No. 12-03443, ECF No. 236).

Additionally, the Court held: "Rodney Tow, Trustee, has the exclusive right to seek to avoid payments made to [ORRI Holder] by the Estate or the Debtor, whether such avoidance is sought under § 544, § 547, § 548 or § 549 of the Bankruptcy Code, subject to paragraph 3(c) of this Order."

Paragraph 3 of the Order states:

In the prosecution of the Trustee's avoidance claims:

a.  The Trustee may seek to prove that the payments made on account of the alleged Overriding Royalty Interest were made on account of a lien or contract that did not create a vested ownership right held by [ORRI Holder] in the hydrocarbons to be produced.

b.  [ORRI Holder] may seek to prove that the payments made on account of the alleged Overriding Royalty Interest were made on account of a vested ownership right held by [ORRI Holder] in the hydrocarbons to be produced.

c.  The Trustee may not pursue § 549 claims that were purchased by Bennu.

d.  The Court does not presently decide what factual disputes may be precluded by this Order.

(*Id.*).

In accordance with the Court's Order, Rodney Tow filed his Amended Complaint against each ORRI Holder on February 24, 2015.  (12-03425, ECF No. 270); (Case No. 12-03429, ECF No. 293); (Case No. 12-03443, ECF No.238).

In each Amended Complaint, Tow removed the original claims for declaratory judgment seeking recharacterization and asserted claims for the avoidance and recovery of transfers made to each ORRI holder by ATP pursuant to §§ 547 and 549.

TM and Diamond have each filed motions to dismiss Tow's Amended Complaint.  Bennu has filed a motion to enforce the Final Sale Order and prevent the Trustee from pursuing § 549 claims sold to Bennu.

## Rule 12(b)(6) Standard

The Court reviews motions under Rule 12(b)(6) by "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).  However, the Court "will not strain to find inferences favorable to the plaintiff." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (internal quotations omitted).

To avoid dismissal for failure to state a claim, a plaintiff must meet Fed. R. Civ. P. 8(a)(2)'s pleading requirements.  Rule 8(a)(2) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  In *Ashcroft v. Iqbal,* the Supreme Court held that Rule 8(a)(2) requires that "the well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct." 556 U.S. 662, 679 (2009) (quoting Rule 8(a)(2)). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[A] complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (internal quotation marks removed).

## May 22, 2015 Hearing

In the ORRI holders' motions to dismiss, they argue, *inter alia*, that Tow's counterclaims (under §§ 547 and 549) must be dismissed for lack of standing and jurisdiction because such

claims are wholly dependent on the success of a threshold recharacterization cause of action, which Tow does not own and cannot assert.  (Case No. 12-03443, ECF No. 249 at 2).  At the May 22, 2015 hearing, the Court took the ORRI Holders' motions to dismiss under advisement.

With respect to Bennu's motion to enforce the sale order, the Court held that the § 549 claims seeking money paid for hydrocarbons from a Telemark or Clipper well were sold to Bennu.  Accordingly, the Court dismissed these § 549 claims[2].  (*See* Case No. 12-03425, ECF No. 284 at 51-52) ("I'm going to find that the claims under 549 and the claims under the Disgorgement Order were either transferred wholly to Bennu to the extent that there is any ambiguity in the Order or alternatively, if there is no ambiguity in the Order . . . that the exclusive right to prosecute those claims was transferred to Bennu. And accordingly, I'm going to grant the various motions to dismiss the Trustee's standing to bring those particular claims.").

### Section 549 Claims Related to Gomez

Based on the Court's May 22, 2015 oral ruling, the only issue remaining from Bennu's motion to enforce the sale order is whether the § 549 claims for the payments on the Gomez well are the property of Bennu or property of the estate.

Accordingly, the Court requested briefing from Bennu, Diamond, and the Trustee on whether the § 549 claims for money paid for hydrocarbons from Gomez wells are an excluded asset under the Asset Purchase Agreement and Final Sale Order.[3]  Specifically, the Court was concerned with how to resolve potentially inconsistent provisions in the APA and Final Sale Order.

---

[2] The Court ruled that the alternative argument for dismissing the Trustee's § 549 claims—i.e. that Bennu's ownership of the recharacterization claims precludes the Trustee's pursuit of § 549 claims—was therefore moot.

[3] Because TM's ORRI only relates to the Telemark and Clipper properties (none relate to Gomez), the Court dismissed Tow's §§ 541(a) and 549 claims against TM with prejudice.  (Case No. 12-03429, ECF No. 315).  Tow's § 547 claims against TM were taken under advisement.

On further review, the Court finds that it need not resolve the alleged inconsistency between the APA and Final Sale Order because (i) the Final Sale Order establishes that Bennu purchased all § 549 claims; and (ii) if and to the extent that the APA is inconsistent with the Final Sale Order, the Final Sale Order governs.   Accordingly, the Court finds that Bennu purchased all of ATP's § 549 claims.

Two separate paragraphs of the Final Sale Order include *all* of ATP's § 549 claims as a Purchased Asset.

Paragraph 11(f) of the Final Sale Order excludes from the Purchased Assets "any preference or avoidance action proceeds pursuant to Section 550 of the Bankruptcy Code (other than those avoidance action proceeds derived from Section 549 of the Bankruptcy Code, **which are included in the Purchased Assets**)." (Case No. 12-36187, ECF No. 2706 at 20) (emphasis added).

To further clarify, paragraph 29 of the Final Order Approving the Sale of the Debtor's Assets provides:

> The Purchased Assets include all of the Debtor's claims, rights and causes of action against the holders of overriding royalty interests, production payments, net profits interests, carried interests or similar interests (the "ORRI/NPI Holders") **with respect to any of the Purchased Assets**, excluding any claims under Chapter 5 of the Bankruptcy Code, other than claims pursuant to Section 549 of the Bankruptcy Code **(for the avoidance of doubt, any claim of the Debtor arising under Section 549 of the Bankruptcy Code shall constitute a Purchased Asset).**

(ECF No. 2706 at 26) (emphasis added).

Tow interprets this paragraph to mean that only the § 549 claims **with respect to the Purchased Assets** (which do not include Gomez) were transferred to Bennu.   He argues that "[t]he parenthetical in paragraph 29 makes it clear that the preceding sentence meant that Bennu was purchasing any Section 549 claims that ATP had for the Purchased Assets" and that "Gomez

was excluded from "Purchased Asset" at the very beginning of paragraph 29." (ECF No. 290 at 5).   In other words, he argues that since Bennu did not purchase the Gomez leases, then it follows that Bennu did not purchase the § 549 claims associated with Gomez.   Tow's interpretation ignores the plain language of the Final Sale Order.

The parenthetical in the last sentence states that any claim of the Debtor[4] arising under § 549 constitutes a "Purchased Asset."   When read with the earlier part of the sentence—which states that "[t]he Purchased Assets include all of the Debtor's claims… with respect to any of the Purchased Assets," all of the Debtor's § 549 claims become expressly included as a Purchased Asset.

The phrase **"for the avoidance of doubt"** is included immediately prior to stating that "*any* claim of the Debtor arising under Section 549 of the Bankruptcy Code shall constitute a Purchased Asset."   The "for the avoidance of doubt" language makes it abundantly clear that the preceding phrases in the sentence should not affect the statement that "*any* claim of the Debtor arising under Section 549 of the Bankruptcy Code shall constitute a Purchased Asset." (ECF No. 2706 at 26) (emphasis added).

This is consistent with the earlier provision in the Final Sale Order—paragraph 11(f)—which also states that "avoidance action proceeds derived from Section 549 of the Bankruptcy Code… are included in the Purchased Assets."

Accordingly, the Final Sale Order unambiguously provides that Bennu purchased all of ATP's § 549 claims.

Paragraph 68 of the Final Sale Order states that "[t]o the extent that this Sale Order is inconsistent with the Purchase Agreement or any prior order or pleading with respect to the

---

[4] At the May 22 hearing, the Court rejected Tow's theory that the estate retained the right to prosecute all § 549 claims because the sale documents and the Disgorgement Order treat "Debtor" and "Debtor's estate" differently so that only assets defined with reference to the "Debtor" were sold under the Final Sale Order.

Motion in this Chapter 11 case, the terms of this Sale Order shall govern." (Case No. 12-36187, ECF No. 2706 at 44).

Accordingly, even if the APA is inconsistent with the Final Sale Order, the Final Sale Order governs.

Based on the above findings, the Court need not consider (i) any intent-based arguments, (ii) whether the ORRI holders' "crossover" argument resolves the alleged inconsistency between paragraph 29 of the Final Sale Order and section 2.02 of the Asset Purchase Agreement ("APA"); (iii) whether the Trustee is estopped from asserting § 549 claims as a result of his previous positions and admissions; or (iv) whether Bennu's ownership of the recharacterization claims precludes the Trustee's pursuit of § 549 claims.

Tow's § 549 claims are dismissed with prejudice.

### Tow's Preference Claims

The ORRI holders assert that Tow's § 547 claims should be dismissed (i) under rule 12(b)(1) because the Trustee lacks standing and (ii) under rule 12(b)(6) because the Trustee cannot plead the elements necessary to maintain a cause of action under § 547.[5]

Both of these bases—rule 12(b)(6) and 12(b)(1)—stem from the argument that Tow's 547 claims fail (or he lacks standing to assert them) because he is unable to obtain a finding of law that recharacterizes the underlying instruments from true ORRIs to debt instruments under Louisiana law.

---

[5] Additionally, TM argues that Tow's § 547 claims should be dismissed because the Trustee amended his counterclaim without seeking leave of this Court in violation of Rules 24(a)(2), 15, and 13 (made applicable under the Bankruptcy Rules). (Case No. 12-03429, ECF No. 306 at 21).  Tow responded to these alleged procedural deficiencies by expressly seeking leave to file the amended counterclaim from the Court.  Because TM has failed to show any prejudice caused by the delay, TM's procedural grounds for dismissal are denied.

This argument relies on two premises, *both* of which must be true to sustain the dismissal motion: (i) Tow does not own the right to seek recharacterization of the underlying instruments under Louisiana law because the recharacterization claims were conveyed to Bennu; and (ii) Tow must seek—and the Court must make—a finding that recharacterizes the instruments under Louisiana law in order for Tow to prevail on each of his § 547 claims.

For the reasons discussed below, the Court rejects the second premise.

### Recharacterization Claims

The term "recharacterization claim" refers to Bennu's right to seek recharacterization of the parties' label of the transactions—overriding royalty interests—as disguised debt instruments under *Louisiana law*.

The parties dispute whether Tow can prevail on a § 547 claim that requires recharacterization as a result of the conveyance of the "recharacterization claims" to Bennu.

A few things appear to be undisputed under the sale documents and Ownership Order: (i) Tow cannot prevail on an action seeking declaratory judgment that an ORRI is a disguised financing transaction under Louisiana law; Bennu owns the exclusive right to prosecute those claims; and (ii) the ATP bankruptcy estate retained the right to prosecute § 547 claims that do not require recharacterization.

Tow's prosecution of the preference actions on behalf of the estate is expressly reserved in the Asset Purchase Agreement, the Final Sale Order, and the Court's Ownership Order.  The APA defines the NPI/ORRI claims (i.e. the "recharacterization claims") transferred to Bennu as "all claims… relating to or challenging the validity of overriding royalty interests, net profits interests or similar burdens on the Assets…" (ECF No. 2706-1 at 17).  However, section 2.03(g) of the APA specifically excludes preference actions from being conveyed to Bennu. (*See* ECF

No. 2706 at 26) (stating that the Excluded Assets include "[a]ll preference and avoidance action proceeds pursuant to Section 550 of the Bankruptcy Code (other than those avoidance action proceeds from Section 549 of the Bankruptcy)…").

In the Final Sale Order, paragraph 11(f) excludes from the Purchased Assets "any preference or avoidance action proceeds pursuant to Section 550 of the Bankruptcy Code (other than those avoidance action proceeds derived from Section 549 of the Bankruptcy Code…)." (Case No. 12-36187, ECF No. 2706 at 20).  Paragraph 29 again excludes preference actions: "The Purchased Assets include…. excluding any claims under Chapter 5 of the Bankruptcy Code, other than claims pursuant to Section 549 of the Bankruptcy Code…" (*Id.* at 26).

Consistent with the sale documents, paragraph 1 of the Court's Ownership Order states: "Bennu Oil & Gas, LLC has the exclusive right against [TM and Diamond] to seek to re-characterize the alleged Overriding Royalty interest held by [TM and Diamond] as something other than a vested ownership right granted to [TM and Diamond] in the hydrocarbons to be produced."  (Case No. 12-03425, ECF No. 264).

The Order establishes that Tow has the exclusive right to seek to avoid payments—including the § 547 preference claims—made to each ORRI holder other than the § 549 claims purchased by Bennu: "Rodney Tow, Trustee, has the exclusive right to seek avoidance payments made to [TM and Diamond] by the Estate or the Debtor, whether such avoidance is sought under § 544, § 547, § 548 or § 549[6] of the of the Bankruptcy Code, subject to paragraph 3(c) of this Order."

The Order concludes by stating that "[t]he Court does not presently decide what factual disputes may be precluded by this Order."

---

[6] As discussed above, paragraph 3(c) states "[t]he Trustee may not pursue § 549 claims that were purchased by Bennu."

Accordingly, the Court must now decide whether the sale documents and this Order preclude the Trustee from asserting his § 547 claims.

### Elements of a Preferential Transfer under § 547

To state a prima facie claim under § 547, Tow must allege that each payment made by ATP to each ORRI holder pursuant to the underlying instruments constituted:

> [A] transfer of an interest of the debtor in property… (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the Debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made… on or within 90 days before the date of the filing of the petition… (5) that enables such creditor to receive more than such creditor would receive if.. (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

With respect to the first three elements, the ORRI holders assert that "[t]he Trustee cannot establish the foregoing elements without first establishing that [TM or Diamond's] ORRI/NPI Interests are properly classified as debts rather than real property interests, which in turn requires recharacterization of the interests themselves." (Case No. 12-03429, ECF No. 306 at 11).  The Court disagrees.

The parties quibble over whether recharacterization requires a finding of law, or as Tow asserts, that recharacterization is merely a factual issue incidental to each § 547 claim.  However, because the Court finds that recharacterization may be unnecessary to sustain any of Tow's § 547 claims, the Court need not resolve this dispute.

As set forth below, the Court could (theoretically, since the pleadings do not conclusively demonstrate that traceable ORRI funds were used to make the ORRI payments) find that an ORRI payment made by ATP to each ORRI holder constitutes a "transfer of the debtor's interest in property" made "on account of an antecedent debt" under § 547 the Bankruptcy Code, without

deciding whether the underlying instruments constitute an overriding royalty interest or disguised debt instrument under Louisiana law.

### Federal Law Governs the Definition of an 'Antecedent Debt' for § 547

Whether a transfer was made "for or on account of an antecedent debt" is a matter of federal law.  *See Matter of Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996) (applying Bankruptcy Code's definition of "debt" for purposes of § 547(b)); *see also In re MarkAir, Inc.*, 240 B.R. 581, 603 (Bankr. D. Alaska 1999) ("While state law is often important in determining rights and duties under the Bankruptcy Code, the Code sometimes trumps state law, including with respect to the definition of 'antecedent debt.'").

The Fifth Circuit has adopted a broad definition of the term "antecedent debt" for purposes of § 547(b).  "Debt" is defined in § 101(12) of the Bankruptcy Code, which states "debt means liability on a claim." "Claim" is itself defined in § 101(5)(A) as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."   It is well settled that "claim" and "debt" are synonymous, such that whenever a "claim" arises, a "debt" necessarily arises as well; the only distinction between the two terms is the party to which it applies. *Matter of Southmark Corp.*, 88 F.3d 311, 317 (5th Cir. 1996) (citing *Penn. Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990) ("This definition reveals Congress' intent that the meanings of 'debt' and 'claim' be coextensive.").

The definition of "debt" can therefore be restated as "a *liability* for payment, whether or not such liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  *See, e.g.*, *In re Enron Corp.*, 357 B.R. 32, 47 (Bankr. S.D.N.Y. 2006).

A debt need not arise from a loan for purposes of § 547(b).  *See McClellan v. Cantrell*, 217 F.3d 890, 895 (7th Cir. 2000) (explaining that "[a] debt is not something you obtain; it is something you incur as a consequence of having obtained money or something else of value from another person…").  "[A] transfer of the debtor's property to or for the benefit of virtually every kind of creditor may be avoided as a preference if the other requirements of section 547(b) are met." 5 *Collier on Bankruptcy* ¶ 547.03[3] (Alan N. Resnick & Henry Sommer eds., 16th ed. 2014).

Indeed, courts have applied this broad definition to find a creditor-debtor relationship under § 547(b) under a wide range of circumstances.  *See, e.g.*, *In re Upstairs Gallery, Inc.*, 167 B.R. 915 (B.A.P. 9th Cir. 1994) (holding that a debtor's payment of a termination fee to lessor pursuant to the parties' agreement to terminate the lease within ninety days of lessee's bankruptcy petition constituted a transfer of the debtor's property on account of an antecedent debt, reasoning that the "debt" arose on the date that the parties entered into the lease and was "antecedent" within the meaning of § 547(b)(2)); *see also In re Prior*, 176 B.R. 485, 495-96 (Bankr. S.D. Ill. 1995) (finding that a district court's order directing payment of the debtor's interest in future oil proceeds to a judgment creditor constituted a preferential transfer subject to avoidance by the trustee under § 547(b)).

Even in cases where an investor is defrauded by a "Ponzi scheme"[7] debtor, courts hold that a debtor's repayment of funds to an earlier investor during the preference period constitutes a transfer of the debtor's interest in property made on account of an antecedent debt. *See, e.g.*,

---

[7] A "Ponzi scheme" is any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors.

*Cohen v. Barge (In re Cohen),* 875 F.2d 508 (5th Cir. 1989) (holding that an investor who was defrauded by the debtor, who had no intention of purchasing promised investments on investor's behalf, was a creditor for preference purposes).

The Court will assume, without deciding, that each ORRI agreement created a real property interest under Louisiana law, owned by the ORRI holders.  If ATP were to have breached its duty under the applicable agreements to forward the property to the ORRI holders, that breach would have caused ATP to incur a debt to the ORRI holders.  If ATP were to have diverted the property for its own use—and then replenished the property via payment to the ORRI holders—ATP's replenishment would have been payment of the incurred debt.

If the diversion and replenishment occurred (a fact that cannot be discerned from the pleadings) each of these debts were "antecedent" when ATP made each alleged preferential transfer because ATP became liable to each ORRI holder at an earlier date.

Determining whether these transactions constitute "debt instruments" under Louisiana law would trigger an entirely different analysis.  However, Tow need not prove that each alleged ORRI constitutes a debt under Louisiana law[8] in order to satisfy the "antecedent debt" requirement for a § 547 preference claim.  Nor does Tow have to establish that the underlying transactions do not constitute true ORRIs under Louisiana law.

The sole issue is whether—when the payments were made to the ORRI holders—the payments were made from the ORRI holder's own property or from ATP's property.

---

[8] Under Louisiana law, the definition of a "debt" appears to be far narrower than the Bankruptcy Code's definition. A loan of money is a contract by which one person pays money to another, and the party receiving the funds "is bound to repay the same numerical amount … regardless of fluctuation in the value of the currency." LA. CIV. CODE ANN. ART. 2907. The definition of a loan provides for the unconditional obligation to repay the money loaned.

Even if the Court were to determine that the underlying instruments were entirely consistent with a real property interest and inconsistent with a debt instrument under Louisiana law[9], this would not preclude the Court from finding that the relevant transactions constituted a payment of a "debt" under the Bankruptcy Code.  This would run afoul with the fundamental principle of bankruptcy preference law[10].  As the Supreme Court observed:

> Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property. Section 547(b) furthers this policy by permitting a trustee in bankruptcy to avoid certain preferential payments made before the debtor files for bankruptcy. This mechanism prevents the debtor from favoring one creditor over others by transferring property shortly before filing for bankruptcy.

*Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) (citations omitted).

Accordingly, because preference actions implicate an important federal interest, the Bankruptcy Code's broad definition of "debt" trumps any state law characterization of the instrument. *See Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (U.S. 1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

---

[9] It is also worth noting that this Court has recognized that some or all of the ATP transactions may be wholly consistent with the definitions of both a debt instrument and a Term ORRI under Louisiana law. (Case No. 12-03443, ECF No. 145 at 13).

[10] Additionally, the parties' stated intent to convey "real property interests" under the relevant documents is not relevant in determining whether these were preferential transfers under § 547(b).  *See Corporate Food Mgmt., Inc. v. Suffolk Cmty. Coll. (In re Corporate Food Mgmt., Inc.),* 223 B.R. 635, 641 (Bankr.E.D.N.Y.1998) (quoting *Cullen Center Bank & Trust v. Hensley (In re Criswell),* 102 F.3d 1411, 1414 (5th Cir.1997)) ("Because a 'preference is an infraction of the rule of equal distribution among all creditors,' ... neither the intent nor motive of the parties is relevant in consideration of an alleged preference under § 547(b).").

### Transfer of an Interest of the Debtor in Property

The Court need not recharacterize the underlying instruments in order to find that the alleged preferential transfers were "of an interest of the debtor in property." 11 U.S.C. § 547(b). The Bankruptcy Code does not define the term "interest of the debtor in property." The Supreme Court, however, has interpreted the term to mean "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. I.R.S.*, 496 U.S. 53, 58, 110 S. Ct. 2258, 2263, 110 L. Ed. 2d 46 (1990). For guidance, the Supreme Court considered the term "interest of the debtor in property" under § 547(b) to be synonymous with the term "property of the estate" under § 541. Courts generally look to state law to determine whether property is an asset of the debtor. *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (U.S. 1979).

The property at issue in each of Tow's § 547 claims is the funds that ATP transferred to each ORRI holder pursuant to the underlying ORRI instruments during the preference period. This determination does not involve consideration of whether the underlying instruments— which were executed years prior to the bankruptcy filing—created true real property interests under Louisiana law.

The fundamental inquiry is whether the cash transfer diminished or depleted ATP's estate. Whether the transfer diminished the estate turns on whether the debtor owned the transferred funds. *See Matter of Southmark Corp.*, 49 F.3d 1111 (5th Cir. 1995) (holding that payment to employee from debtor's checking account, which contained commingled funds as part of a cash management system, constituted a preferential transfer because debtor "held complete legal title, all indicia of ownership, and unfettered discretion to pay creditors of its own choosing, including its own creditors."); *In re Chase & Sanborn Corp. (Nordberg v. Sanchez),*

813 F.2d 1177, 1181 (11th Cir. 1987) ("[A]ny funds under the control of the debtor, regardless of the source, are properly deemed to be the debtor's property, and transfers that diminish that property are subject to avoidance."); *see also Love v. First Interstate Bank of Montana,* 155 B.R. 225, 230 (Bankr. D. Mont. 1993) ("The dispositive question is whether the Debtor had direct control of the funds.").

Transfers of property or funds that the debtor has stolen, misappropriated, converted or fraudulently obtained may constitute transfers of the debtor's property. *See, e.g.*, *Burgoyne v. McKillip*, 182 F. 452, 453 (8th Cir. 1910) ("In case of embezzlement or misappropriation of funds, the person defrauded may at his option assert a demand as upon implied contract to repay, and such a demand is provable in bankruptcy… The holder of the demand cannot, as an ordinary creditor, take and hold transfers of property from the insolvent defaulter free from the provisions of the bankruptcy act respecting preferences.").

Property of the estate includes both legal and equitable title to property.  11 U.S.C. § 541(a)(1).  There does not appear to be any dispute between the parties that *legal* title to the transferred funds was in ATP's name.  The issue in this proceeding is whether the transfers are recoverable based on an analysis of whether the Estate was depleted if ATP lacked *equitable* title to the funds.

The burden of proof on establishing that the transferred property was estate property rests on ATP.  Assuming that ATP satisfies its burden that it had *legal* title to the funds, a legal presumption of equitable title arises.  TM may rebut that presumption.   *In re LandAmerica Fin. Grp., Inc.*, 412 B.R. 800, 810 (Bankr. E.D. Va. 2009) (finding that equitable title to the funds was presumptively property of the estate because the debtor held the funds in a bank account in its name and under its exclusive control.  "To rebut this presumption . . . [Claimant] must show

that it retained some right to the funds.  Any such right to the funds must be established as an interest in property recognized under state law."); *In re 1031 Tax Grp., LLC*, 439 B.R. 47, 70-71 (Bankr. S.D.N.Y.) supplemented, 439 B.R. 78 (Bankr. S.D.N.Y. 2010) (finding that to contest the validity of the debtor's equitable title in the property, a claimant must demonstrate that it retained equitable title in the property).

There are at least two ways to rebut the presumption that property in the debtor's control is property of the estate: (i) the earmarking doctrine and (ii) the trust doctrine.

Under the earmarking doctrine, funds provided to a debtor for the purpose of paying a specific indebtedness may (under limited circumstances) not be recoverable as a preference from the creditor to which they are paid, because the property transferred in such a situation was never property of the debtor and therefore did not disadvantage other creditors.[11]  This doctrine is inapplicable.

Under the trust doctrine, a trustee cannot recover funds for the benefit of the estate once it has been determined that the transferred funds were trust assets, as those assets do not become property of the debtor's estate. *In re E.D.B. Constr. Corp.*, No. 11-76129-REG, 2013 WL 6183849, at *3 (Bankr. E.D.N.Y. Nov. 26, 2013).  When a debtor holds property in trust under applicable non-bankruptcy law, the equitable interest in that property belongs to the trust beneficiary, not the debtor.  The equitable interest does not become Estate property.  11 U.S.C. § 541(d).

---

[11] *See Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1356 (5th Cir. 1986) ("In cases where a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly 'earmarked.'") (quoting 4 *Collier on Bankruptcy* ¶ 547.25 at 547–(101–102) (15th ed. 1986).

In addition to statutory trusts, claimants have attempted to use the constructive trust doctrine to defend avoidance actions.[12]

### Tracing Requirement

It is black letter law that when property that is presumptively property of the estate by virtue of the debtor's possession and control is alleged to be held in trust for the benefit of a claimant, the burden is on the claimant to establish that a trust relationship exists, and if necessary, trace the funds it received to trust property in a commingled account.

> When property in the possession of a debtor is alleged to be held in trust by the debtor for a nondebtor, and therefore not estate property under section 541(a)(1) or (2), the burden rests upon the entity seeking to exclude the property from the estate to establish the existence of the claimed fiduciary relationship. That entity must prove title and identify the trust fund or property and, where the fund or property has been commingled with the general property of the debtor, must sufficiently trace the property.

5 *Collier on Bankruptcy* ¶ 541.28 (Alan N. Resnick & Henry Sommer eds., 16th ed. 2014); *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 307 (7th Cir. 2014) ("There can be no constructive trust without tracing a claimant's interest to specific property."); *In re Philip Servs. Corp.*, 359 B.R. 616, 626 (Bankr. S.D. Tex. 2006) ("As a general rule, any party seeking to impress a trust upon funds for purposes of exemption from a bankrupt estate must identify the trust fund in its original or substituted form.") (quoting *First Fed. of Michigan v. Barrow*, 878 F.2d 912, 915 (6th Cir. 1989)); *See also In re E.D.B. Constr. Corp.*, No. 11-76129-REG, 2013 WL 6183849, at *4 (Bankr. E.D.N.Y. Nov. 26, 2013) ("the funds in a commingled account may be used to pay unsecured creditors unless a trust beneficiary can trace a superior right to those funds. Therefore, the funds in a commingled account that could have been used to pay other creditors presumptively constitute[ ] property of the estate.").

---

[12] Some courts have rejected the applicability of the constructive trust doctrine in bankruptcy preference litigation. See, *e.g., In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994).

The tracing requirement also applies to cases where the debtor transfers property that the debtor does not own, but has legal control of based on consignment, bailment, or agency relationships.  *See In re Rine & Rine Auctioneers, Inc.*, 74 F.3d 854, 860 (8th Cir. 1996) ("In a true consignment arrangement, bailment, or agency, recovery by the bailor, principal, or consignor rests upon identification. When the property involved, or its proceeds, has been intermingled with other goods or funds of the debtor's, the owner must definitely trace that which he claims as contained in the assets of the estate.") (internal citations omitted).

In *Beiger*, the Supreme Court carved out a narrow exception to the tracing requirement. *Begier v. I.R.S.*, 496 U.S. 53, 110 S. Ct. 2258, 110 L. Ed. 2d 46 (1990).  As an airline, the debtor was required to collect excise taxes from its customers for payment to the IRS. § 4291.  Pursuant to § 7501, the amount of the excise taxes is "held to be a special fund in trust for the United States," and are often called "trust-fund taxes."

During the 90 day period before filing for bankruptcy, the airline had paid the IRS for the taxes it owed—some payments were made out of a separate trust account and other payments were made out of the debtor's general accounts.  The trustee filed an adversary action against the IRS to recover the entire amount that the airline had paid for trust-fund taxes during that 90-day preference period.  The Supreme Court reversed the bankruptcy court's decision allowing the trustee to avoid payments that the debtor made out of its general accounts.

In determining that tracing was unnecessary in this particular context, the Supreme Court differentiated between a trust created under common law and a statutory trust created under the Internal Revenue Code:

> Under common-law principles, a trust is created *in property;* a trust therefore does not come into existence until the settlor identifies an ascertainable interest in property to be the trust res. A § 7501 trust is radically different from the common-law paradigm, however…Unlike a common-law trust, in which the settlor sets

> aside particular *property* as the trust res, § 7501 creates a trust in an abstract "amount"-a dollar *figure* not tied to any particular assets-rather than in the actual dollars withheld. Common-law tracing rules, designed for a system in which particular property is identified as the trust res, are thus unhelpful in this special context.

*Begier v. I.R.S.*, 496 U.S. 53, 62, 110 S. Ct. 2258, 2265, 110 L. Ed. 2d 46 (1990) (internal citations omitted).

Accordingly, the Supreme Court reached its decision based on (i) its interpretation that § 7501 does not mandate segregation as a prerequisite to the creation of the trust; and (ii) in the absence of any suggestion in the Bankruptcy Code about what tracing rules to apply, the Supreme Court examined the legislative history.

In analyzing legislative intent, the Supreme Court noted that Congress intended to overturn the Supreme Court's ruling in *Randall,* where it prohibited the IRS from recovering withheld taxes ahead of the bankruptcy proceeding's administrative expenses where the debtor failed to place withheld taxes into a separate account. *United States v. Randall*, 401 U.S. 513, 91 S. Ct. 991, 28 L. Ed. 2d 273 (1971). The Supreme Court noted that a House Report to the 1978 Restructuring of the Bankruptcy Code states:

> A payment of withholding taxes constitutes a payment of money held in trust under Internal Revenue Code § 7501(a), and thus will not be a preference because the beneficiary of the trust, the taxing authority, is in a separate class with respect to those taxes, if they have been properly held for payment, as they will have been if the debtor is able to make the payments.

*Begier v. I.R.S.*, 496 U.S. 53, 66, 110 S. Ct. 2258, 2267, 110 L. Ed. 2d 46 (1990) (quoting H.R. Rep. No. 95-595).[13]

---

[13] Additionally, the Supreme Court noted that a Senate bill attacked *Randall* directly, providing in § 541 that trust-fund taxes withheld or collected prior to the filing of the bankruptcy petition were not "property of the estate." *See* S. Rep. No. 95-1106, at 33 ("These amounts will not be property of the estate regardless of whether such amounts have been segregated from other assets of the debtor by way of a special account, fund, or otherwise, or are deemed to be a special fund in trust pursuant to provisions of applicable tax law").

The Supreme Court adopted a literal reading of this passage, finding that the trustee "could not avoid *any* voluntary prepetition payment of trust-fund taxes, regardless of the source of the funds." (*Id.* at 66).

In this case, no exception to the ordinary common-law tracing requirement applies.  The ORRI holders have not alleged that an ORRI agreement creates a special type of trust that would make ORRI payments immune from common-law tracing principles.

Each ORRI holder's motion to dismiss fails to address several crucial facts.  Each motion fails to assert whether ATP was contractually required to maintain a separate trust account and whether separate trust funds were used to make the alleged preferential transfers.  Certain ORRI agreements expressly permit a payment window between when ATP receives proceeds from production and when it is required to pay the ORRI holder's share of the proceeds.  (*See* Case No. 12-03425, ECF No. 281 at 17) (providing that ATP shall pay Diamond "within thirty (30) days next following the close of each calendar month.").

Although the facts are unartfully pled, the Court notes that the record in the case before it lends credence to the possibility that the payments might have been in satisfaction of a debt.  On August 24, 2012, Albert Reese—then ATP's Chief Financial Officer—testified that ATP was not current on its net profit interests and ORRI payments, stating that it owed approximately $23.4 million from production proceeds received prepetition. (Case No. 12-36187, ECF No. 186 at 96). He testified that these funds were diverted to pay other expenses that were necessary to continue operations.  (*Id.* at 97).  At the conclusion of the hearing, Charles Kelly—counsel for ATP— indicated that only certain ORRI agreements contained an escrow requirement, while other ORRIs were merely subject to payment windows.  (*Id.* at 372-373).

The outcome of Tow's § 547 claims may depend upon fact issues surrounding the mechanics of how ATP made each alleged preferential transfer.  For example, ATP could have incurred a debt if ATP used Diamond's share of the proceeds to pay for other expenses by (i) borrowing funds from a separate Diamond trust account; (ii) failing to place Diamond's share of the proceeds in an escrow account as required under the contract; or (iii) failing to comply with the payment schedule with traceable funds.   If any of these events occurred, and ATP subsequently paid Diamond from ATP's own funds during the 90 day preference period, the payment would constitute a transfer of an interest in the debtor's property.

### Tow's § 547 Claim against Diamond

Tow alleges that in May of 2009, ATP and Diamond entered into a "Farmout Agreement" and "Conveyance of Overriding Royalty Interest" by which ATP granted Diamond an ORRI in the Leases entitling Diamond to receive a limited "net profits interest" attributable to any Hydrocarbons produced and saved from the Leased Lands. (Case No. 12-03425, ECF No. 270 at 3-5).   In exchange for the ORRI, the parties agreed to convert approximately $116,400,000 in accrued accounts payable for past drilling services performed by Diamond into the initial contribution toward the ORRI account, and agreed that thereafter such amount would be increased by invoices for drilling services provided by Diamond in the future.   Tow has sufficiently alleged facts to establish the "antecedent debt" requirement for purposes of § 547 of the Bankruptcy Code.

Tow alleges that two preferential transfers—$9,701,526.00 on June 20, 2012 and $7,894,844.00 on July 3, 2012—were made by ATP to Diamond pursuant to the alleged ORRI transaction. (*Id*. at 10).  Fact issues remain as to whether these payments constitute "transfer[s] of an interest of the debtor in property…"" § 547(b).

Accordingly, Diamond's motion to dismiss Tow's § 547 claims is denied.

### Tow's § 547 Claim against TM

Tow alleges that in January of 2010, ATP entered into a "Purchase and Sale Agreement" with GMZ Energy, TM Energy and other parties, under which ATP agreed to sell and GMZ Energy agreed to purchase a term ORRI for $27,533,333.33, and TM Energy agreed to purchase a perpetual ORRI for $466,666.67.  (Case No. 12-03429, ECF No. 293 at 3).  ATP also entered into a "Farmout Agreement" with TM Energy in January of 2010, in which ATP granted TM an ORRI in exchange for $25,000,000.00 in cash.  (*Id.* at 5).  The parties subsequently made several amendments to the terms of their agreements.  Tow has sufficiently alleged facts to establish the "antecedent debt" requirement under § 547.

Tow alleges that a preferential transfer in the amount of $1,031,847.00 was made to TM on May 31, 2012.  (Case No. 12-03429, ECF No. 293 at 10).  Fact issues remain as to whether these payments constitute "transfer[s] of an interest of the debtor in property..." § 547(b).

Accordingly, TM's motion to dismiss Tow's § 547 claim is denied.

### Conclusion

The Court will enter Orders consistent with this Memorandum Opinion.

SIGNED **February 4, 2016.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE